NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# Arizona Court of Appeals
### Division One

PATRICIA IBARRA, *Petitioner Employee,*

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent,*

OLIVE GARDEN RESTAURANT, *Respondent Employer,*

LIBERTY MUTUAL INSURANCE CORPORATION, *Respondent Carrier.*

No. 1 CA-IC 20-0005
FILED 10-1-2020

Special Action - Industrial Commission
ICA Claim No. 20162-66085
Carrier Claim No. WC608C68215
The Honorable Rachel C. Morgan, Administrative Law Judge

**AFFIRMED**

COUNSEL

Snow Carpio & Weekley, PLC, Phoenix
By Erica Rose Gonzalez-Melendez
*Counsel for Petitioner Employee*

Industrial Commission of Arizona, Phoenix
By Gaetano J. Testini
*Counsel for Respondent*

Lundmark Barberich LaMont & Slavin, PC, Phoenix
By Lisa M. LaMont
*Counsel for Respondent Employer and Carrier*

---

**MEMORANDUM DECISION**

Presiding Judge James B. Morse Jr. delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge Paul J. McMurdie joined.

---

**M O R S E**, Judge:

¶1　　　Petitioner Patricia Ibarra challenges an award issued by the Industrial Commission of Arizona ("ICA") that found she had a 1.32% loss of earning capacity after a work-related injury. She alleges error in the formula used by the ICA and proposes a different formula based on *Whyte v. Indus. Comm'n*, 71 Ariz. 338 (1951), which held that earnings in 1949 were not a reasonable basis for computing lost earning capacity from an injury that happened in 1942. We are not persuaded that Ibarra provided adequate evidence to invoke the *Whyte* comparison. We, therefore, affirm the award.

**FACTS AND PROCEDURAL BACKGROUND**

¶2　　　Ibarra has worked for Olive Garden since 2007. She worked in the kitchen as a pasta cook and line cook for years until she was injured and diagnosed with work-related bilateral wrist injuries in 2016. After she had surgery on her right wrist, she was medically released back to work, restricted to light duty, and was told to avoid forceful gripping. Olive Garden put her to work as a hostess, which she has continued since 2017. As a cook, she was making $13.15 per hour. She began earning $13.00 an hour upon moving to the hostess position in 2017. By the date of the hearing, she had received two raises and was making $13.70 per hour.

¶3　　　Ibarra's claim was closed in March 2018, with a 3% permanent impairment for each wrist. The ICA claims division found that she had no loss of earning capacity, and Ibarra requested a hearing before an administrative law judge ("ALJ") to contest that finding.

¶4 The parties agree that Ibarra's wage at the time of injury was $13.15 per hour,[1] and that her current wage as a hostess is $13.70 per hour. For purposes of this case, they also agree that she works an average of 30 hours per week. The ALJ heard from Ibarra and two labor market consultants. Ibarra testified that she still experiences pain in her arms but continues to work. She speaks Spanish, almost exclusively, and understands only a little English, which makes it hard for her to work as a hostess.[2] She testified that for much of her time working as a hostess, she had not performed all of the hostess duties due to her limited English. One of her primary activities was to roll up silverware in napkins for placement on tables.

¶5 The testimony of Ibarra's labor market consultant, Nolan McKelvey, focused on a dispute over the average hours per week that Ibarra worked as a hostess. After the hearing, Ibarra conceded that she averaged 30 hours of work per week, making much of McKelvey's testimony immaterial. McKelvey did not explain why he used the numbers he used for computing loss of earning capacity. McKelvey's testimony and written report make clear, however, that he used the 2016 minimum wage as Ibarra's post-injury wage in computing her loss of earning capacity because hostess positions start at minimum wage. Based on a generic minimum wage calculation, McKelvey determined that Ibarra suffered a lost earning capacity of about 38%, or $646.23 of her $1,692.65 average monthly wage. Ibarra asserts that it is necessary to use the wages of a hostess to calculate her loss of earning capacity because work restrictions prevent her from returning to her prior occupation as a cook.

¶6 Respondents' labor market consultant, Diane Nayhouse, testified that she calculated a 1.32% loss of earning capacity by comparing Ibarra's pre-injury hourly wage of $13.15 to the 2016 equivalent of her current $13.70 hourly wage, which, according to the Consumer Price Index, was $12.85. Nayhouse did not explain why she used the 2016 equivalent of Ibarra's current wage.

---

[1] Loss of earning capacity is determined pursuant to A.R.S. § 23-1044(C) by using average monthly wage to find reduced monthly earning capacity. An average monthly wage is determined by multiplying an hourly wage by the number of weekly hours worked on average, then multiplying by a factor of 4.333. Ibarra's average monthly wage at the time of her injury was set at $1,692.65.

[2] Ibarra testified at the hearing using a Spanish-language interpreter.

¶7        The ALJ issued a decision in November 2019.  She noted the rebuttable presumption that a worker's current earnings reflect the worker's earning capacity and found that Ibarra had not rebutted this presumption. The ALJ further found it was proper to use the "rollback" wage of $12.85 per hour in determining whether there was any lost earning capacity.  She attributed greater weight to Nayhouse's testimony than McKelvey's and found a 1.32% loss of earning capacity.  After a summary affirmance upon administrative review, Ibarra filed this statutory special action.

**DISCUSSION**

¶8        In ICA cases, we deferentially review reasonably supported factual findings but independently review legal conclusions.  *Warren v. Indus. Comm'n*, 202 Ariz. 10, 12, ¶ 12 (App. 2002).  Ibarra has the burden to prove a loss of earning capacity and, if so, how much.  *Schuck & Sons Const. v. Indus. Comm'n*, 213 Ariz. 74, 78, ¶ 14 (App. 2006).  Post-injury earnings raise a rebuttable presumption that those earnings are commensurate with earning capacity.  *Maness v. Indus. Comm'n*, 102 Ariz. 557, 559 (1967); *see also Dye v. Indus. Comm'n*, 23 Ariz. App. 68, 71 (1975) (Jacobsen, J., specially concurring) ("[T]he best evidence of earning capacity is [post-injury earnings].").  A party may rebut the presumption by a showing that post-injury earnings do not reflect actual earning capacity.  *See Shroyer v. Indus. Comm'n*, 98 Ariz. 388, 392 (1965)  (noting that an "increase in general wage levels," claimant's increased "maturity or training," pay based on "sympathy to claimant," and "the temporary and unpredictable character of post-injury earnings" may establish that post-injury earnings are unreliable) (quoting 2 Larson's Workmen's Compensation Law § 57.21 (1952)).  We agree with the ALJ that Ibarra has not rebutted the presumption.

¶9        Ibarra first argues that the presumption in *Maness* should not apply to this case because her job as a hostess does not require her to perform "all of the functions of a hostess."  She implies that her current position and wages are based on sympathy or something unrelated to earning capacity because she does not perform all the typical duties of a hostess.  The ALJ rejected that argument, and we agree.  At the time of the hearing, Ibarra had been working as a hostess for two years and had received two raises.  She presented no evidence that her employment and hourly wage as a hostess was based on anything other than merit and a long-standing employment relationship.

¶10        The only dispute is about the method of calculating the loss of earning capacity.   The parties agree that the starting point for determining Ibarra's loss of earning capacity is her pre-injury average

monthly wage as a cook. The ALJ determined loss by comparing the pre-injury average monthly wage with Ibarra's current wage, rolled back to a 2016 level to remove any effect of inflation. Ibarra claims that the starting wage for a hostess in 2016, the year of her injury, should be compared to her pre-injury average monthly wage, because that is the type of comparison that the Arizona Supreme Court made in *Whyte*. This is not a fair reading of *Whyte*.

¶11            In *Whyte*, a steelworker was severely injured in 1942, resulting in the loss of one leg and substantial loss of use of the other. 71 Ariz. at 340. After hospitalization and convalescence, including the fitting of a prosthesis, he was reemployed by the same company as a "timekeeper" due to his physical limitations. *Id*. His wage as a timekeeper from 1947 to 1949 was almost as much as he had been paid as a steelworker in 1942. *Id*. at 341. In 1949, the ICA held a hearing to determine the injured steelworker's loss of earning capacity. *Id*. The ICA used the difference between his 1942 and 1949 average monthly wages to find a small loss of earning capacity from his injuries. *Id*. The Arizona Supreme Court rejected that calculation because it did not account for and remove the effects of economic conditions that took place after World War II. *Id*. at 343-44; *see also Warren*, 202 Ariz. at 13-14, ¶ 21 ("The supreme court decided *Whyte* in 1951, during the postwar business boom but when memories of the great depression remained fresh. The accepted interpretation of *Whyte* has been that post-injury earnings must be discounted for inflation since the date of injury.") (citation omitted). The Court ruled that the legislature did not intend that economic factors such as booms or depressions must be included in the measure for loss of earning capacity. *Whyte*, 71 Ariz. at 345. The legislature instead intended to provide a "yardstick" of fixed length by which to measure loss. *Id*. at 344. Thus, the Court compared the employee's pre-injury, 1942 average monthly wage as a steelworker with the average monthly wage of a timekeeper at the steel company in 1942. *Id*. at 346. The Court reasoned that, upon being injured, the employee could no longer perform the duties of a steelworker but could earn a wage as a timekeeper. *Id*. at 345-46. The Court cautioned, however, that the ruling was limited in its application:

> This formula, however, applies only in cases where the increase or decrease in wages is due solely to a change in economic conditions that occurs between the date the injury takes place and the date the injury becomes stationary, as in this case. It has no application where the difference in wages during that period is due to a change in the physical condition of the injured employee directly and proximately resulting

from said injury or due to the peculiar or special efficiency of such employee.

71 Ariz. at 346-47. The rule established in *Whyte* has been called the "equal measure" rule. *Reavis v. Indus. Comm'n*, 196 Ariz. 280, 283, ¶ 16 (App. 1999).

**¶12**        Ibarra's argument fails because she has not provided the evidence needed to make the *Whyte* comparison. The *Whyte* court ruled that the wage to be compared to the pre-injury average monthly wage should be the average wage of the company's timekeepers in 1942. 71 Ariz. at 346. The equivalent here would be the average wage of Olive Garden hostesses in 2016. Ibarra only provided evidence of the starting wage for a new hostess and did not provide evidence necessary to make the *Whyte* comparison.

**¶13**        Further, Ibarra produced no evidence to rebut the presumption that her current earnings reflect her earning capacity. *Maness*, 102 Ariz. at 559. Ibarra was not treated as an entry-level employee when she was hired as a hostess in 2017. She had worked for the restaurant for ten years, and there is no evidence that her employer would have treated her as an entry-level, minimum-wage employee in 2016. Thus, there is reasonable evidence to support the ALJ's decision, and Ibarra's argument that the ALJ should have used the 2016 minimum wage is without merit.

## CONCLUSION

**¶14**        Ibarra has not shown error in the award. We affirm.

